Kit A. Pierson
Brent W. Johnson
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., NW
Suite 500 West
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Email:  kpierson@cohenmilstein.com
         bjohnson@cohenmilstein.com

*Attorneys for Representative Plaintiff*
*Schuten Electronics, Inc.*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SCHUTEN ELECTRONICS, INC.,**<br><br>                    Plaintiff, and on behalf of all<br>                    others similarly situated,<br><br>        v.<br><br>**AVX CORPORATION; ELNA AMERICA INC.; HITACHI CHEMICAL CO., LTD.; HITACHI CHEMICAL COMPANY AMERICA, LTD.; KEMET CORPORATION; KEMET ELECTRONICS CORPORATION; MATSUO ELECTRIC CO., LTD.; NEC TOKIN CORPORATION; NEC TOKIN AMERICA, INC.; NICHICON CORPORATION; NICHICON (AMERICA) CORPORATION; NIPPON CHEMI-CON CORPORATION; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; ROHM CO., LTD.; ROHM SEMICONDUCTOR U.S.A., LLC, RUBYCON CORPORATION; RUBYCON AMERICA INC.; ELNA CO., LTD.; SANYO ELECTRIC GROUP, LTD.; SANYO ELECTRONIC DEVICE (U.S.A.) CORPORATION; SAMSUNG ELECTRO-MECHANICS; SAMSUNG ELECTRO-MECHANICS AMERICA, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (USA) INC.; TOSHIN KOGYO CO., LTD.; UNITED CHEMI-CON CORPORATION; and VISHAY INTERTECHNOLOGY, INC.**<br><br>                    Defendants. | Case No.<br><br>**ANTITRUST CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Case No.

ANTITRUST CLASS ACTION COMPLAINT

Plaintiff Schuten Electronics, Inc. ("Plaintiff"), individually and on behalf of a class of all others similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and demands a jury trial.

## INTRODUCTION

1.    Plaintiff alleges that Defendants – the largest manufacturers of capacitors in the world – conspired, combined, or contracted to fix, raise, maintain or stabilize the prices of aluminum and tantalum electrolytic capacitors that they sold in the United States from at least as early as January 1, 2005, through the present, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  As a result of Defendants' unlawful conduct, Plaintiff and other members of the Class paid supra-competitive prices for aluminum and tantalum electrolytic capacitors.

2.    Capacitors (including aluminum and tantalum electrolytic capacitors) are a fundamental component of electrical circuits and, as such, capacitors are ubiquitous in electronic devices.  Indeed, common electronic devices contain hundreds of capacitors per device.  The central function of a capacitor is to store an electrical charge.

3.    As electronic devices have become increasingly central components of our day-to-day lives, industry has responded to the increased demand with more production of the electronic components needed to produce those devices.  The capacitors market is so large because of their essential nature to all types of electronic devices.  Revenues for capacitor manufacturers in the 2013 fiscal year were about $16 billion globally according to some reports. Analysts believe that the capacitor industry may show revenue of $18 billion in the 2014 fiscal year.  This revenue is comprised of an average price per unit of $0.001149, or $11.49 per thousand pieces, according to some estimates.  The market includes the sale of trillions of capacitors.

4.    In the early 2000s, however, new types of capacitors entered the market and the demand for aluminum and tantalum electrolytic capacitors slowed.  In the 2005 fiscal year, revenues for aluminum and tantalum electrolytic capacitors were $6.8 billion according to some reports.  Revenues decreased significantly in the 2012 fiscal year to $6.3 billion. In the 2013 fiscal year, they were $5.73 billion.  In light of this trend, the capacitor manufacturers agreed that

Case No.                                     2

to not compete on price for their mutually interchangeable aluminum and tantalum electrolytic capacitors, all in an effort to protect their profits.

5. Defendants conspired and communicated to control market prices of aluminum and tantalum electrolytic capacitors. Their agreement and efforts were directed at the United States market and their products were sold there. These communications occurred over at least nine and a half years.

6. Prices for aluminum and tantalum capacitors increased or their decline was slowed as a result of Defendants' anticompetitive actions. Plaintiff and the Class paid artificially inflated prices for the capacitors they directly purchased from Defendants and paid more than they would have in a competitive market. Directly due to Defendants' conduct, Plaintiff and the Class suffered injury and continue to suffer injury to date.

7. Defendants' actions were brought to the attention of competition authorities and investigations of Defendants' anticompetitive conduct in the capacitors market have been launched in the United States, the People's Republic of China, Japan, South Korea, Taiwan, and Europe. In conjunction with these investigations, raids of several of Defendants' facilities have taken place.

## JURISDICTION AND VENUE

8. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

10. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

ANTITRUST CLASS ACTION COMPLAINT

11. This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; sold aluminum and tantalum electrolytic capacitors throughout the United States, including in this District; had substantial contacts with the United States, including in this District; or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

12. Assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws was substantially conducted with, directed to, or impacted Plaintiff and members of the Class in counties located within the Division. *See* Civil Local Rule 3.2 (c) and (e).

## PARTIES
### Plaintiff

13. Plaintiff Schuten Electronics, Inc. is an Illinois corporation located at 200 N. Michigan Ave., Elmhurst, Illinois 60126. Plaintiff purchased aluminum and/or tantalum electrolytic capacitors directly from one or more Defendants during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

### Defendants

### AVX

14. Defendant AVX Corporation is a Delaware corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. It is a subsidiary of Kyocera Corporation, a Japanese corporation that owns approximately 72% of the outstanding common stock in AVX Corporation. In or about February 2013, AVX acquired Nichicon's tantalum capacitor production facilities in Japan and China, thereby expanding their global tantalum capacitor manufacturing operations. During the Class Period, AVX Corporation

ANTITRUST CLASS ACTION COMPLAINT

1   manufactured, sold and distributed tantalum electrolytic capacitors either directly or through its

2   subsidiaries, agents or affiliates to customers throughout the United States.

3        15.    Defendant AVX Corporation is referred to herein as "AVX."

4                                 **Elna**

5        16.    Defendant Elna Co., Ltd., is a Japanese corporation with its principal place of

6   business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture, 222-

7   0033, Japan. During the Class Period, Elna Co., Ltd., manufactured, sold, and distributed

8   aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to

9   customers throughout the United States.

10       17.    Defendant Elna America Inc., a California corporation, is a wholly-owned

11   subsidiary of Elna Co., Ltd., with its principal place of business located at 879 West 190th Street,

12   Suite 100, Gardena, California 90248. During the Class Period, Elna America Inc. sold and

13   distributed aluminum electrolytic capacitors to customers throughout the United States.

14       18.    Defendants Elna Co., Ltd., and Elna America Inc. are together referred to herein

15   as "Elna."

16                         **Hitachi Chemical**

17       19.    Defendant Hitachi Chemical Co., Ltd., is a Japanese corporation with its principal

18   place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo,

19   100-6606, Japan. During the Class Period, Hitachi Chemical Co., Ltd., manufactured, sold, and

20   distributed aluminum electrolytic capacitors either directly or through its subsidiaries, agents or

21   affiliates to customers throughout the United States.

22       20.    Defendants Hitachi Chemical Company America, Ltd., a New York corporation,

23   is a wholly-owned subsidiary of Hitachi Chemical Co., Ltd., with its principal place of business

24   located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014. During the

25   Class Period, Hitachi Chemical Co. America sold and distributed aluminum electrolytic

26   capacitors to customers throughout the United States.

27       21.    Defendants Hitachi Chemical Co., Ltd. and Hitachi Chemical Company America,

28   Ltd., are together referred to herein as "Hitachi."

**KEMET**

22.     Defendant KEMET Corporation is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681.  During the Class Period, KEMET Corporation manufactured, sold and distributed aluminum and tantalum electrolytic capacitors directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

23.     On March 12, 2012, KEMET Corporation announced that it agreed to form a capital and business alliance with NEC Tokin Corporation because of their respective professed interests in increasing its tantalum electrolytic capacitor sales, reducing costs in areas such as procurement and production, sharing their technological knowledge, and benefiting financially through the cross-selling of each other's products.  As a result of this alliance, KEMET received 34% of the outstanding shares of NEC Tokin (the remainder being held by non-party NEC Corporation), which provided KEMET with 51% of the outstanding voting rights. KEMET currently holds the option to purchase NEC Corporation's shares in NEC Tokin, which would thereby effect an acquisition of NEC Tokin by KEMET.

24.     Defendant KEMET Electronics Corporation, a Delaware corporation, is a wholly owned subsidiary of KEMET Corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681.  During the Class Period, KEMET Electronics Corporation manufactured, sold and distributed aluminum and tantalum electrolytic capacitors directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

25.     Defendants KEMET Corporation and KEMET Electronics Corporation are together referred to herein as "KEMET."  The KEMET-NEC Tokin alliance shall be referred to herein as "KEMET-NEC Tokin."

**Matsuo**

26.     Defendant Matsuo Electric Co., Ltd., is a Japanese corporation with its principal place of business located at 3-5-3 Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan.  During the Class Period, Matsuo Electric Co., Ltd., manufactured, sold and distributed aluminum and

Case No.                                6

ANTITRUST CLASS ACTION COMPLAINT

tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. Matsuo Electric Co., Ltd., is referred to herein as "Matsuo."

**NEC Tokin**

27. Defendant NEC Tokin Corporation is a Japanese company with its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. During the Class Period, NEC Tokin Corporation manufactured, sold, and distributed aluminum and/or tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates throughout the United States.

28. Defendant NEC Tokin America, Inc., a California Corporation, is a wholly-owned subsidiary of NEC Tokin Corporation with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Class Period, NEC Tokin America, Inc., sold and distributed aluminum and/or tantalum electrolytic capacitors throughout the United States.

29. Defendants NEC Tokin Corporation and NEC Tokin America, Inc., are together referred to herein as "NEC Tokin."

**Nichicon**

30. Defendant Nichicon Corporation is a Japanese corporation with its principal place of business located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto, 604-0845 Japan. During the Class Period and until the company's sale of its tantalum capacitor production operations to AVX Corporation in February 2013, Nichicon Corporation manufactured, sold, and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States. During the entire Class Period, Nichicon Corporation manufactured, sold and distributed aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

31. Defendant Nichicon (America) Corporation, an Illinois corporation, is a wholly-owned subsidiary of Nichicon Corporation with its principal place of business located at 927 East State Parkway, Schaumburg, Illinois 60173. During the Class Period and until Nichicon

Case No.                                    7

1    Corporation's sale of its tantalum capacitor production operations to AVX Corporation in

2    February 2013, Nichicon (America) Corporation sold, and distributed tantalum electrolytic

3    capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout

4    the United States.  During the entire Class Period, Nichicon (America) Corporation sold and

5    distributed aluminum electrolytic capacitors to customers throughout the United States.

6        32.    Defendants Nichicon Corporation  and Nichicon  (America) Corporation are

7    together referred to herein  as "Nichicon."

8                                **Nippon Chemi-Con**

9        33.    Defendant Nippon Chemi-Con Corporation is a Japanese corporation with its

10   principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan.

11   During the Class Period, Nippon Chemi-Con Corporation manufactured, sold, and distributed

12   aluminum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to

13   customers throughout the United States.

14       34.    Defendant United Chemi-Con Corporation, an Illinois Corporation, is a wholly-

15   owned subsidiary of Nippon Chemi-Con Corporation with its principal place of business located

16   at 9801 West Higgins Road, Rosemont, Illinois 60018.  During the Class Period, United Chemi-

17   Con manufactured, sold and distributed aluminum electrolytic capacitors either directly or

18   through its subsidiaries, agents or affiliates to customers throughout the United States.

19       35.    Defendants Nippon Chemi-Con Corporation and United Chemi-Con Corporation

20   are together referred to herein as "Nippon Chemi-Con."

21                               **Panasonic and Sanyo**

22       36.    Defendant Panasonic Corporation is a Japanese corporation with its principal

23   place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  Until

24   October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric

25   Industrial Co., Ltd.  During the Class Period, Panasonic Corporation manufactured, sold and

26   distributed aluminum and tantalum electrolytic capacitors either directly or through its

27   subsidiaries, agents or affiliates to customers throughout the United States.

28

Case No.                           8

ANTITRUST CLASS ACTION COMPLAINT

1     37.     Defendant Panasonic Corporation of North America, a wholly-owned subsidiary

2 of Panasonic Corporation, and is a Delaware corporation with its principal place of business

3 located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period,

4 Panasonic Corporation of North America sold and distributed aluminum and tantalum

5 electrolytic capacitors to customers throughout the United States.

6     38.     Defendant Sanyo Electric Group, Ltd., a Japanese corporation, is, as of December

7 2009, a wholly-owned subsidiary of Panasonic Corporation, with its principal place of business

8 located at 5-5, Keihan-hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the

9 Class Period, Sanyo Electric Group, Ltd., manufactured, sold and distributed aluminum tantalum

10 electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers

11 throughout the United States.

12     39.     Defendant Sanyo Electronic Device (U.S.A.) Corporation, a Delaware

13 corporation, is a wholly-owned subsidiary of Sanyo Electric Group, Ltd., with its principal place

14 of business located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class

15 Period, Sanyo Electronic Device (U.S.A.) Corporation sold and distributed tantalum electrolytic

16 capacitors to customers throughout the United States.

17     40.     Defendants Panasonic Corporation, Panasonic Corporation of North America,

18 Sanyo Electric Group, Ltd., and Sanyo Electronic Device (U.S.A.) Corporation are collectively

19 referred to herein as "Panasonic." With regard to any allegations pertaining to Sanyo Electric

20 Group, Ltd. and Sanyo Electric Device (U.S.A.) Corporation prior to their acquisition by

21 Panasonic, they are referred to herein as "Sanyo."

22 **ROHM**

23     41.     Defendant ROHM Co., Ltd., is a Japanese corporation with its principal place of

24 business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585 Japan. During the Class

25 Period, ROHM Co., Ltd., manufactured, sold, and distributed tantalum electrolytic capacitors

26 either directly or through its subsidiaries, agents or affiliates to customers throughout the United

27 States.

28

Case No.          9

ANTITRUST CLASS ACTION COMPLAINT

1        42.     Defendant ROHM Semiconductor U.S.A., LLC, a Delaware limited liability

2   corporation, is a subsidiary of ROHM Co., Ltd., with its principal place of business located at

3   2323 Owen Street, Suite 150, Santa Clara, California 95054.  During the Class Period, ROHM

4   Semiconductor U.S.A., LLC, sold and distributed tantalum electrolytic capacitors to customers

5   throughout the United States.

6        43.     Defendants ROHM Co., Ltd., and ROHM Semiconductor U.S.A., LLC, are

7   together referred to herein as "ROHM."

8                                    **Rubycon**

9        44.     Defendant Rubycon Corporation is a Japanese corporation with its principal place

10  of business located at 1938-1, Nishi-Minowa Ina-City, Nagano Prefecture 399-4593, Japan.

11  During the Class Period, Rubycon Corporation manufactured, sold, and distributed aluminum

12  electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers

13  throughout the United States.

14       45.     Defendant Rubycon America Inc., an Illinois corporation, is a wholly-owned

15  subsidiary of Rubycon Corporation with its principal place of business located at 4293 Lee

16  Avenue, Gurnee, Illinois 60031.  During the Class Period, Rubycon America Inc., sold and

17  distributed aluminum electrolytic capacitors to customers throughout the United States.

18       46.     Defendants Rubycon Corporation and Rubycon America Inc., are together

19  referred to herein as "Rubycon."

20                                    **SEMCO**

21       47.     Defendant Samsung Electro-Mechanics is a South Korean corporation with its

22  principal place of business located at (443-743) 150 Maeyoungro (Maetan-dong), Yeongtong-gu,

23  Suwon-si, Gyeonngi-do, Republic of Korea.  It is a wholly-owned subsidiary of Samsung Group,

24  a South Korean *chaebol* (*i.e.*, a business conglomerate).  During the Class Period, Samsung

25  Electro-Mechanics manufactured, sold, and distributed tantalum electrolytic capacitors either

26  directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

27       48.     Defendant Samsung Electro-Mechanics America, Inc., a California corporation, is

28  a subsidiary of Samsung Electro-Mechanics with its principal place of business located at 3333

Case No.                          10
ANTITRUST CLASS ACTION COMPLAINT

Michelson Drive, Suite 500, Irvine, California 92612.  During the Class Period, Samsung Electro-Mechanics America, Inc., sold and distributed tantalum electrolytic capacitors to customers throughout the United States.

49.     Defendants Samsung Electro-Mechanics and Samsung Electro-Mechanics America, Inc., are together referred to herein as "SEMCO."

**Taiyo Yuden**

50.     Defendant Taiyo Yuden Co., Ltd., is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan.  During the Class Period, Taiyo Yuden Co., Ltd., manufactured, sold and distributed tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.

51.     Defendant Taiyo Yuden (USA) Inc., an Illinois corporation, is a wholly-owned subsidiary of Taiyo Yuden Co., Ltd., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173.  During the Class Period, Taiyo Yuden (USA) Inc. sold and distributed aluminum and/or tantalum electrolytic capacitors to customers throughout the United States.

52.     Defendants Taiyo Yuden Co., Ltd., and Taiyo Yuden (USA) Inc. are collectively referred to herein as "Taiyo Yuden."

**Toshin Kogyo**

53.     Defendant Toshin Kogyo Co., Ltd., is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo 101-0047, Japan.  During the Class Period, Toshin Kogyo Co., Ltd., manufactured, sold, and distributed aluminum and tantalum electrolytic capacitor products either directly or through its subsidiaries or affiliates throughout the United States.  Toshin Kogyo Co., Ltd., is referred to herein as "Toshin Kogyo."

**Vishay**

54.     Defendant Vishay Intertechnology, Inc., is a Delaware corporation with its principal place of business located at 63 Lancaster Avenue, Malvern, Pennsylvania 19355.  During the Class Period, Vishay Intertechnology, Inc., manufactured, sold, and distributed

Case No.                                    11

ANTITRUST CLASS ACTION COMPLAINT

aluminum and tantalum electrolytic capacitors either directly or through its subsidiaries, agents or affiliates to customers throughout the United States.  Vishay Intertechnology, Inc., is referred to herein as "Vishay."

## CO-CONSPIRATORS

55. Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

56. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

57. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

58. During the Class Period, Defendants and their co-conspirators sold substantial quantities of aluminum and/or tantalum electrolytic capacitors in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

59. The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### BACKGROUND: CAPACITORS

60. Capacitors are categorized as passive electronic components that store an electrical charge.  Capacitors are distinct from batteries in that capacitors only store an electrical charge whereas batteries provide an electrical charge.

61. A capacitor is made of two close conductors (usually plates) that are separated by an insulating material known as a dielectric material.  The plates accumulate electric charge

Case No.                                              12

when connected to power source.  One plate accumulates positive charge and the other plate accumulates negative charge.  Capacitors are often categorized based on three central features.

62.     First, capacitors are categorized by their capacitance.  The capacitance is the amount of electric charge that is stored in a capacitor at voltage of 1 Volt.  The capacitance is measured in units of Farad.

63.     Second, capacitors are distinguished from each other by whether they are electrolytic or electrostatic.  Electrolytic capacitors are polarized, meaning that they have positive and negative leads that must be positioned the correct way in an electric circuit.  In contrast, electrostatic capacitors are not polarized (*i.e.*, they do not have positive and negative leads) and therefore can be installed in either direction with respect to the flow of current.  The allegations in this complaint focus on electrolytic capacitors.

64.     Finally, capacitors are categorized by the type of dielectric material used.  Any non-conductive material can be a dielectric, including tantalum, ceramic, glass, film, aluminum, niobium oxide, plastic, paper, barium titanate, and other conductive materials.  However, for the purposes of this complaint three main dielectric materials are key: aluminum, tantalum, and ceramic.

65.     Aluminum electrolytic capacitors contain two aluminum foils stacked around an electrolyte-soaked paper.  One aluminum foil acts as the anode, and that foil is covered with an oxide layer that serves as the dielectric.  The other foil is uncoated and acts as a cathode.  Aluminum capacitors are used in a variety of devices, including larger electronic devices (televisions, desktop and laptop computers, video game consoles, consumer audio and video devices, automotive electronics and power inverters), but they usually have lower volumetric efficiency than other capacitors such as tantalum or certain kinds of ceramic capacitors.  They also have a higher likelihood of leaking the charge they hold as compared to tantalum and other kinds of ceramic capacitors.

66.     Tantalum electrolytic capacitors use tantalum powder to create a thin dielectric layer in the capacitor, which produces high capacitance values.  The capacitance of a tantalum capacitor can be improved by increasing the surface area of the tantalum powder that is used in

ANTITRUST CLASS ACTION COMPLAINT

the device.  Tantalum is a blue-gray metallic chemical element that is great for conducting heat and energy.  Tantalum capacitors play a primary role in the electronics sector, particularly with smaller devices. They can charge circuit boards with electricity and are therefore useful for anything containing a circuit board, such as a smartphone or computer.  They are best suited for charging smaller electronics rather than larger ones because they are small in size and can function long term in these situations.

67.     Ceramic is another element frequently utilized as a dielectric.  Ceramic functions well as a dielectric because it allows electrostatic repulsion and attraction to occur across its surface.  The two main types of ceramic capacitors available are disc and multi-layer ceramic (MLC) capacitors.  All types generally have a fixed capacitance value, but they usually fall on the lower end of capacitance.  Ceramic disc capacitors are beneficial in situations that require accuracy in a small space at a low cost.  MLC capacitors are useful when a device needs a high capacitance in small space.

68.     Capacitors are sold to three types of direct buyers including original equipment manufacturers ("OEMs"), electronic manufacturing service ("EMS") providers, and third-party distributors.  OEMs purchase capacitors to be installed directly into electronic devices they manufacture.  Examples of OEMs that would purchase aluminum and tantalum electrolytic capacitors include Intel, GE Automatic, Cisco Systems, or HP.  Capacitors are also sold to electronic manufacturing service ("EMS") providers such as FoxConn, Selectron Technologies, Sanmina, Flash Electronics, and Advanced Mechantronics Solutions.  EMS providers manufacture electric circuits and other items containing capacitors that are then integrated into electronic devices by other manufacturers.  Finally, capacitors are sold to third-party distributors such as Aero Corporation, ABnet Communications, TTI Inc., and Digikey Electronics, who then re-sell the capacitors.

69.     Demand for consumer electronics has expanded swiftly in the past 10-15 years, and the demand for capacitors has increased proportionally.  As certain types of consumer devices become more or less popular, the relative demand for the capacitors suited to those devices rises or falls accordingly.  For example, larger electronic devices such as televisions and

ANTITRUST CLASS ACTION COMPLAINT

desktop computers typically relied on aluminum capacitors. Indeed, nearly 50% of revenues for aluminum capacitors derived from desktop computer sales. With the introduction of smaller computing devices such as smartphones and tablet computers, however, demand for desktop computers has decreased and with it, demand for aluminum capacitors.

70.     Newer electronic devices such as smart phones and tablet computers have relied more heavily on smaller, more efficient ceramic capacitors. Accordingly demand for aluminum and tantalum electrolytic capacitors has been stagnant or decreasing over the last ten years.

71.     For example, Defendant Nichicon's 2013 Annual Report states that the company's 21.7% decrease in capacitor sales "is attributed to declining demand for digital home electronics and inverter equipment." Likewise, Defendant Taiyo Yuden's 2013 Annual Report notes that "[t]he electronics industry, to which [TaiyoYuden] belongs, has seen continued growth from the smartphone and tablet device markets. In contrast to this, the PC and television markets remain sluggish. Overall this has caused weaker demand for electronic components." Defendant AVX Corporation made a similar observation in its 2013 Annual Report stating, "[o]verall sales prices for our commodity component products declined during 2013."

**THE CONSPIRACY**

72.     As demand for aluminum and tantalum electrolytic capacitors declined, prices and profit margins began to erode. Aluminum and tantalum electrolytic capacitors products of like capacitance, dielectric and form factor are, in most instances, mutually interchangeable for each other, and Defendants understood that their only means of competition in the wake of declining demand was further price reductions.

73.     But Defendants had one thing going for them: despite the declining demand for aluminum and tantalum electrolytic capacitors, these capacitors still remained critical to the development of certain types of electric circuits used in electronic devices. Moreover, their purchasers – OEMs, EMS Providers, and third-party distributors – were almost always committed to inflexible production or delivery deadlines to their respective customers, and accordingly could be forced to accept a price increase in order to avoid production delays or customer dissatisfaction.

ANTITRUST CLASS ACTION COMPLAINT

74.     And thus, a plan emerged: no later than January 1, 2005, Defendants agreed to end competition among each other as to their respective aluminum and tantalum electrolytic capacitors to slow or halt price erosion.

75.     Defendants arrived at this plan and reached agreement via a series of written, electronic and oral communications amongst themselves that took place during the time just preceding the Conspiracy and throughout the Class Period.

76.     Following the Conspiracy's commencement, Defendants remained in regular contact regarding prices, sales, and lead-times for aluminum and tantalum electrolytic capacitors. Defendants regularly exchanged sensitive information– including data only one to two months old and forward-looking predictions for the market – to ensure the Conspiracy's success.

77.     For example, manufacturers, distributors, and industry representatives would provide forward-looking sales trend information that was then shared among other trade association members.  The Electronics Components Industry Association ("ECIA") collects and disseminates the following information on a quarterly basis:



ANTITRUST CLASS ACTION COMPLAINT

78.     Market participants also share information regarding whether quoted lead times will be increasing, decreasing, or remain stable.  This information is broken-up among responding party (*i.e.*, manufacturer, distributor, etc.), allowing Defendants to effectively monitor the industry for compliance with their conspiracy.  For example, the following forward-looking information is gathered and disseminated on an quarterly basis from the Electronics Communications Industry Association:



79.     The ECIA then provides a breakdown of respondents, allowing Defendants even greater clarity into one-another's plans for future quoted lead times:

| Manufacturer | Down > 5% | Down > 3% - 5% | Down > 1% - 3% | Flat (Down 1% - Up 1%) | Up > 1% - 3% | Up > 3% - 5% | Up > 5% | | Count |
|---|---|---|---|---|---|---|---|---|---|
| Capacitors | 0% | 0% | 0% | 11% | 67% | 11% | 11% | | 9 |
| Connectors | 0% | 0% | 0% | 0% | 33% | 44% | 22% | | 9 |
| Electro-Mechanical | 0% | 0% | 0% | 15% | 38% | 38% | 8% | | 13 |
| Inductors | 0% | 0% | 0% | 22% | 44% | 22% | 11% | | 9 |
| Resistors | 0% | 0% | 17% | 0% | 33% | 33% | 17% | | 6 |
| Semiconductors | 0% | 0% | 0% | 9% | 45% | 36% | 9% | | 11 |

ANTITRUST CLASS ACTION COMPLAINT

80.     Defendants could use this sensitive information to detect and address any cheating (*i.e.*, pricing outside the agreement, increased output, shorter lead times).  Accordingly, any temporary downward price adjustments during the Class Period could be quickly brought in line with the cartel's coordinated strategy.

81.     Defendants' Conspiracy immediately slowed (and at certain times reversed) the downward price pressure on their aluminum and tantalum electrolytic capacitors portfolios and thus ensured that two substantial portfolios heading towards technological obsolescence remained profit centers far longer than they otherwise would have.  For example, it is notable that set against this backdrop of decreasing demand, Defendants effectively raised the prices for tantalum electrolytic capacitors from $82.43 per thousand pieces before the Conspiracy in 2004 to $106.18 per thousand pieces in 2013, a price increase of approximately $23.75 per thousand pieces in nine years.  Likewise, Defendants managed to dramatically slow the price decline for pricing of aluminum electrolytic capacitors from a decline of $6.95 per thousand pieces before the conspiracy to an average decline of $1.12 per thousand pieces after the conspiracy.

82.     The effects of Defendants' concerted and collusive actions were significant and, in fact, were counter to what the market would expect given the comparative and continual decline in demand for aluminum and tantalum electrolytic capacitors that began in the early 2000s.  Notably, industry and government data suggests that per unit prices for aluminum and tantalum electrolytic capacitors began to stabilize in 2005.

## CHARACTERISTICS OF THE CAPACITORS MARKET

83.     The structure and characteristics of the electrolytic capacitors market is particularly conducive to a price-fixing agreement, and they make allegations of collusion particularly plausible in this market.  These factors are discussed below.

### Industry Concentration

84.     A high degree of concentration facilitates coordination among co-conspirators. The fewer competitors in a market, the easier it is for those competitors to collude.  The markets for aluminum and tantalum electrolytic capacitors are highly concentrated.

Case No.                                        18

ANTITRUST CLASS ACTION COMPLAINT

85.     The last twenty-five years have witnessed several key acquisitions in the capacitors market that have resulted in an increasingly consolidated industry.  Although this acquisition activity has affected all types of capacitors on the market, the tantalum electrolytic capacitors seem to have been a focal point of the investigations.  Indeed, 45% of all capacitor and material related transactions between 1990 and 2014 related to the tantalum supply chain according to industry estimates.  Key acquisitions include Defendant Vishay's acquisition of Transitor and NACC Mallory in 2001; Defendant Kemet's purchase of the tantalum division of EPCOS AG located in Evora, Portugal, in 2005; Defendant Nichicon Corporation's purchase of the tantalum division of Panasonic Industrial Corporation in 2005; Defendant Panaonic's merger with Sanyo Corporation, which then brought Panasonic back into the tantalum capacitor business that it had exited in 2005; and Defendant Kemet's purchase of Niotan's capacitor-grade tantalum powder producer in the USA.

86.     This acquisition activity, coupled with high barriers to entry, has resulted in an increasingly consolidated industry.  Defendants KEMET-NEC Tokin, Panasonic, AVX, Vishay, SEMCO, and ROHM currently together control approximately 85% of the global market for tantalum electrolytic capacitors.  In terms of market revenue, the seven largest manufacturers of tantalum electrolytic capacitors account for approximately 95% of the global market's current revenue.

87.     The market for aluminum electrolytic capacitors is similarly small: Defendants Nippon Chemi-Con, Nichicon, Rubycon, Panasonic and Elna are estimated by industry analysts to collectively hold approximately 59% of the global market.  Adding in the smaller market shares of Defendants Hitachi, Matsuo and Toshin Kogyo, Defendants' collective share in the aluminum electrolytic capacitors market is approximately 67%.  Moreover, the 13 largest manufacturers of aluminum electrolytic capacitors account for approximately 92% of the market's current revenue.

88.     Defendants possessed sufficient market share to impose price increases and ensure price stabilization during the he Class Period.  All non-Defendant fringe competitors were

ANTITRUST CLASS ACTION COMPLAINT

too small to meet the production needs of key customers and thus these fringe competitors were unable to undercut Defendants' prices.

### High Barriers to Entry

89. The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

90. Companies seeking to manufacture and sell aluminum and tantalum electrolytic capacitors without having any prior involvement in the capacitors market face various significant barriers to their entry. Thus, those fringe companies producing aluminum and tantalum electrolytic capacitors could not sufficiently ramp up production to become large enough to undermine Defendants' conspiracy.

91. The barriers to entry for new market participants are quite high. New market entrants would need substantial start-up capital – likely exceeding hundreds of millions of dollars – in addition to access to production technology, raw materials, and sufficient supply chain commitments to warrant such a significant outlay of capital.

92. Given the significance of these hurdles it is not surprising that no new manufacturers have entered the market for aluminum or tantalum electrolytic capacitors in well over a decade (excluding companies that emerged as a result of the significant acquisition activity that has occurred in the industry).

### Inelastic Demand

93. Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

94. The demand for aluminum and tantalum electrolytic capacitors is inelastic. As set forth above, aluminum and tantalum electrolytic capacitors are critical to the manufacture of certain types of electric circuits used in electronic devices. When there are few or no substitutes

ANTITRUST CLASS ACTION COMPLAINT

1   for a product, purchasers have little choice but to pay higher prices in order to produce their

2   product.  Because OEMs, EMS Providers, and third-party distributors regularly had inflexible

3   production and delivery deadline commitments with their own customers, there often was no

4   immediate substitute for the aluminum and tantalum capacitors needed to make those

5   commitments.  Indeed, no other type of passive electrical component (such as an inductor or

6   resistor) would be able to serve an equivalent function and thus to satisfy production and

7   delivery demands Defendants' purchasers had no alternatives to aluminum and tantalum

8   capacitors.

9          95.    Moreover, because the cost of a capacitor is small as compared to other

10  components of electrical devices and extremely small as compared to the cost of the electrical

11  device itself, purchasers will often accept a price increase for capacitors rather than forgo the

12  opportunity to sell the electrical device.

13         96.    Indeed, demand inelasticity for capacitors is particularly acute when a given

14  electric circuit or an electronic device requires not just a capacitor, but one with a specific

15  capacitance, dielectric and form factor. In that instance, a purchaser has no choice but to buy a

16  specific capacitor with the required technical and operational characteristics.

17                              **Commoditization**

18         97.    When a product is characterized as a commodity, market participants typically

19  compete on the basis of price rather than other attributes such as product quality or customer

20  service.  Where competition occurs principally on the basis of price, it is easier to implement and

21  monitor a cartel because price is more often objectively measurable and observable than non-

22  price factors such as service.

23         98.    Aluminum and tantalum electrolytic capacitors are standardized and mass-

24  produced.  Indeed, Defendants work together with their trade associations to identify technical

25  and operational criteria necessary for standardization.  These working groups include Defendants

26  as well as representatives from key purchasers so that the various groups can all provide input on

27  the criteria for standardization.  For example, the ECA Committee on Tantalum Capacitors

28  includes Defendants Kemet, AVX, Panasonic, and Vishay, as well as Intel Corporation and IBM.

ANTITRUST CLASS ACTION COMPLAINT

1    The Committee on Tantalum Capacitors met regularly to survey new technologies, create new

2    standards, and adapt existing standards to changes in the marketplace.

3        99.    The result of these efforts to develop industry standards is that capacitors of like

4    capacitance, dielectric and form factor are in most instances mutually interchangeable for each

5    other.

6        100.    Finally, many capacitors of different capacitance, dielectric, and form factor can

7    be substituted for each other depending on the design of the electrical circuit and other technical

8    specifications.

9                                        **Declining Demand**

10       101.    Static or declining demand is one factor which makes the formation of a collusive

11   arrangement more likely. Under normal business conditions, when faced with weak demand

12   conditions, firms will attempt to increase sales by taking market share from competitors by

13   decreasing prices. For this reason, firms faced with static or declining demand have a greater

14   incentive to collude to avoid price competition with competitors in order to ballast their declining

15   business.

16       102.    As discussed more fully above, demand for aluminum and tantalum electrolytic

17   capacitors is closely tied to the demand for certain consumer electronics, and as demand for

18   those consumer electronics has declined, demand for aluminum and tantalum capacitors has

19   similarly declined in the last 10-15 years.

20                       **Opportunities for Conspiring and Sharing Information**

21       103.    Industry trade associations facilitate collusion because they can serve as a pretext

22   through which co-conspirators can relay, transmit and receive sensitive information pertaining to

23   product pricing and market allocation. The capacitor industry has a number of them, including

24   the Electronic Components Industry Association ("ECIA"), which is one of the largest and

25   includes Defendants AVX, KEMET, and Panasonic as members. The ECIA advertises itself as

26   granting members access to "industry peers and executive networking" by creating events that

27   enable personal meetings "with leaders of the authorized electronic components industry."

28   Another trade association – the European Passive Components Industry Association – also

**ANTITRUST CLASS ACTION COMPLAINT**

provides networking opportunities for leaders of the capacitor industry, and includes Defendants Nichicon, AVX and Panasonic as members.

104.    Defendants have utilized their common membership in trade associations as well as the business relationships they had developed between their executives, officers and employees, to collude.  Specifically, they have used pretextual networking opportunities and their established relationships to discuss competitive information pertaining to their aluminum and tantalum electrolytic capacitor products and to agree on their pricing for said products. These communications occurred at in-person meetings, telephone conversations, and through written correspondences, e-mails and text messaging.

105.    Moreover, as discussed more fully above, the trade associations to which Defendants belong facilitate their conspirator by collecting and aggregating competitive information including sales in terms of dollars and units.  The aggregate data is then circulated to Defendants with a short time lag, allowing Defendants to monitor each other's pricing.

106.    Defendants also attended various trade conferences which allowed them to meet without drawing attention.  For example, the employees of Defendants regularly attended the Electronics Distribution Show and the Consumer Electronics Show.  These shows provided numerous opportunities for Defendants to meet privately to further the Conspiracy.

107.    Another avenue Defendants utilized to share information and reduce competition was the use of private labeling agreements.  Private labeling is done to fill gaps in a company's portfolio of parts, but "discussing it is frowned upon," according to industry insiders.  Private labeling agreements allow for competitors to fill orders for each other and share in the profits for those orders.  They allowed both parties to control the re-sale prices of capacitors while simultaneously sharing in the profits from those sales.

108.    Defendants also possess numerous informal connections between their former and current colleagues, co-venturers, or partners employed by other Defendant companies.  These connections provided ample opportunity to exchange competitively sensitive information. Notably, the key decision-makers for the major producers had personal access to each other both directly and indirectly.

ANTITRUST CLASS ACTION COMPLAINT

109.     Finally, industry analysts provide yet another source of information for Defendants.  Analysts gather and share detailed competitive information among Defendants. These analysts provide, for a fee, market data on pricing, supply, and other key indicators of market activity as well as market projections. Given the limited number of analysts that cover the capacitors industry, and the high degree of concentration within the industry, those that do are often provided highly detailed information and direct access to decision-makers for the capacitors manufacturers, including Defendants.

**COMPETITION AUTHORITIES INVESTIGATE CAPACITORS INDUSTRY**

110.     Competition authorities in the United States – as well as competition authorities in Japan, the People's Republic of China, South Korea, Taiwan, and Europe – have launched investigations into price fixing in the capacitors industry.

111.     According to media and industry sources, the People's Republic of China's National Development and Reform Commission ("NDRC"), the governmental entity charged with regulating competition by the Chinese State Counsel, conducted raids of several Chinese operations of Japanese capacitors manufacturers in March 2014.

112.     The NDRC publicly confirmed its investigation into the capacitors industry though a report by published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau in early July, 2014.  In this report, Xu revealed that one Japanese capacitor company self-reported its anticompetitive actions, and that this company and other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products.

113.     According to industry sources, the Antitrust Division of the United States Department of Justice ("DOJ") confirmed in April 2014 that the government has opened an investigation into price fixing in the capacitors industry.

114.     Some sources have suggested that these investigations began in part because Defendant Panasonic approached U.S. and Chinese authorities to report its involvement in the conspiracy and seek amnesty.

ANTITRUST CLASS ACTION COMPLAINT

115.     The U.S. Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA")
provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses
its conduct to the Department of Justice ("DOJ").  According to U.S. Department of Justice
guidelines, a corporate amnesty applicant must "admit its participation in a criminal antitrust
violation involving price fixing, bid rigging, capacity restriction, or allocation of markets,
customers, or sales or production volumes before it will receive a conditional leniency letter.  A
company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets
might be inferred from its conduct but that cannot produce any employees who will admit that the
company entered into such an agreement generally has not made a sufficient admission of
criminal antitrust violation to be eligible for leniency.  A company that, for whatever reason, is
not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for
leniency."  By applying for leniency through ACPERA, the cartel member believed to be
Panasonic must have admitted to price fixing in the capacitors industry.

116.     Investigations into the capacitor industry were also launched in early 2014 by
competition authorities in the European Commission, South Korea and Taiwan.  The Japan Fair
Trade Commission ("JFTC") has been investigating price-fixing in the aluminum and tantalum
electrolytic capacitor industry for even longer, but it has recently stepped up its investigations by
raiding the offices at least eight capacitor manufacturers suspected of membership in a price-
fixing cartel, including those of Defendants Hitachi Chemical, Nichicon, Panasonic, NEC Tokin,
and Nippon Chemi-Con.  Media sources indicate that these raids, conducted on or about June 24,
2014, were based on JFTC suspicions that a cartel had formed after the industry experienced a
set of financial setbacks, not least of which being the onset of the financial crisis in 2008 and the
natural disaster resulting from the 2011 Tohoku earthquake and tsunami.  Sources close to the
JFTC investigation indicated that, for at least several years, sales executives and other officials in
the companies that were raided discussed and agreed upon increasing prices for the capacitors
they produced.

117.     Several Defendants have acknowledged having been the target of recent raids and
investigations by competition authorities.  Defendant Panasonic confirmed having been raided by

ANTITRUST CLASS ACTION COMPLAINT

the JFTC and South Korean authorities; Defendant Taiyo Yuden confirmed to having been raided by the NDRC and has stated that it is cooperating with Chinese authorities; Defendant NEC Tokin confirmed that it has been contacted or raided by American, Chinese and European authorities and has stated that it is cooperating with authorities; and Toshin Kogyo confirmed that it has been contacted by Japanese, Chinese, and Taiwanese authorities.

118. Two of the Defendants – Panasonic and Sanyo – have admitted to engaging in illegal price-fixing conspiracies in two other industries: lithium ion battery cells and automotive parts. Notably, both conspiracies overlapped in time with the conspiracy alleged herein. Sanyo plead guilty for its role in a conspiracy to fix prices on cylindrical lithium ion battery cells for use in notebook computer battery packs, and agreed to pay a $10.731 million criminal fine. Similarly, Panasonic pled guilty for its role in a nearly six and a half year-long conspiracy to fix prices of switches, steering angle sensors, and automotive high intensity discharge ballasts installed in automobiles. Panasonic ultimately agreed to pay a $45.8 million criminal fine, and a number of its executives pled guilty in exchange for limited fines and imprisonment.

## FRAUDULENT CONCEALMENT

119. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until March 2014, when foreign competition authorities began investigating the industry.

120. Because Defendants' alleged conspiracy was kept secret until at least March 2014, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for aluminum and tantalum electrolytic capacitors throughout the United States during the Class Period.

121. Moreover, Defendants' concerted pricing remained unnoticed for many reasons including the facts that pricing for these capacitors changes frequently and the sheer number and variety of aluminum and tantalum electrolytic capacitors rendered it nearly impossible to track market-wide movement in pricing.

ANTITRUST CLASS ACTION COMPLAINT

122.   The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

123.   By its very nature, Defendants' conspiracy was inherently self-concealing. Aluminum and tantalum electrolytic capacitors are not exempt from antitrust regulation, and thus, before March 2014, Plaintiff reasonably considered the aluminum and tantalum electrolytic capacitors industry to be a well-regulated, competitive industry.

124.   Additionally, Defendants made affirmative statements to conceal their conspiracy. For example, Defendants publicly stated that the price changes and increased lead times for aluminum electrolytic capacitors were due to lack of available aluminum foil.  Similarly, Defendants claimed that price changes and increased production lead times for tantalum electrolytic capacitors were the result of tantalum shortages.

125.   Under the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' aluminum and tantalum electrolytic capacitors prices before March 2014.

126.   Plaintiff and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

127.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until March 2014, when investigations by foreign competition authorities of the aluminum and tantalum electrolytic capacitors industry were first made publicly known.

128.    None of the facts or information available to Plaintiff and members of the Class prior to March 2014, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

129.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and members of the Class have alleged in this Complaint.

130.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning aluminum and tantalum electrolytic capacitors, which they affirmatively concealed, at least in the following respects:

(a)    By communicating secretly to discuss output and prices of aluminum and tantalum electrolytic capacitors;

(b)    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(c)    By attributing pricing to reasons other than their anticompetitive agreement; and

(d)    By falsely describing the market for aluminum and tantalum electrolytic capacitors as competitive.

131.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's and the Class's claims have been tolled.

## EFFECTS OF THE CONSPIRACY

132.    As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for aluminum and tantalum electrolytic capacitors than they would have paid in a competitive market.

133.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

ANTITRUST CLASS ACTION COMPLAINT

1       (a)    price competition in the markets for aluminum and tantalum electrolytic

2   capacitors has been artificially restrained;

3       (b)    prices for aluminum and tantalum electrolytic capacitors sold by

4   Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

5       (c)    purchasers of aluminum and tantalum electrolytic capacitors from

6   Defendants have been deprived of the benefit of free and open competition in the aluminum and

7   tantalum electrolytic capacitors markets.

8   **CLASS ALLEGATIONS**

9       134.    Plaintiff brings this action on behalf of itself and as a class action pursuant to

10  Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of a similarly situated Class,

11  which is defined as follows:

12  > All persons and entities who purchased aluminum and/or tantalum
    > electrolytic capacitors in the United States directly from one or

13  > more of Defendants, or from any predecessors, parents,
    > subsidiaries, agents or affiliates thereof, at any time between

14  > January 1, 2005, and the present.  Excluded from the Class are
    > Defendants, their parent companies, subsidiaries, or affiliates, and

15  > federal governmental entities and instrumentalities of the federal
    > government.

16

17      135.    Plaintiff believes that there are hundreds of Class members located throughout the

18  United States, the exact number and their identities being known by Defendants, making the

19  Class so numerous and geographically dispersed that joinder of all members is impracticable.

20      136.    There are questions of law and fact common to the Class, including:

21      (a) Whether Defendants and their co-conspirators engaged in a combination and

22      conspiracy among themselves to restrict output and to fix, raise, maintain, or

23      stabilize the prices of aluminum and tantalum electrolytic capacitors sold in the

24      United States;

25      (b) The identity of the conspiracy's participants;

26      (c) The duration of the conspiracy alleged in this Complaint and the acts carried out

27      by Defendants and their co-conspirators in furtherance of the conspiracy;

28      (d) Whether the alleged conspiracy violated Section 1 of the Sherman Act;

ANTITRUST CLASS ACTION COMPLAINT

(e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and the other Class members;

(f) The effect of the conspiracy on the prices of aluminum and tantalum electrolytic capacitors sold in the United States during the Class Period; and

(g) The appropriate Class-wide measure of damages.

137.     These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

138.     Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws, in that they paid artificially inflated prices for products purchased directly from Defendants or their co-conspirators.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members.   Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

139.     Plaintiff is represented by competent counsel experienced in the prosecution of antitrust and class action litigation.

140.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

141.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

142.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous

individual actions would engender.  This action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSE OF ACTION

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT - 15 U.S.C. § 1

143.    Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

144.    Beginning at least as early January 1, 2005, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for aluminum and tantalum electrolytic capacitors in the United States, and entered into a continuing agreement, understanding and conspiracy in restraint of trade to exchange information regarding output and production capacity that had the effect of restricting output and of fixing, raising, maintaining, or stabilizing the prices of aluminum and tantalum electrolytic capacitors.

145.    Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and Class members have paid more for aluminum and tantalum electrolytic capacitors than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

146.    Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

147.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

ANTITRUST CLASS ACTION COMPLAINT

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

B.      That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.      That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

D.      That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

E.      That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

F.      That Defendants be enjoined from continuing their participation in the alleged conspiracy.

G.      For such other and further relief as is just and proper under the circumstances.

ANTITRUST CLASS ACTION COMPLAINT

1

2  Dated: August 14, 2014                Respectfully submitted,

3                                        */s/ Matthew Ruan*_____

4                                        George Farah (*Pro Hac Vice* forthcoming)
                                         Matthew Ruan (State Bar No. 264409)
5                                        COHEN MILSTEIN SELLERS & TOLL, PLLC
                                         88 Pine Street
6                                        14th Floor
                                         New York, NY 10005
7                                        Tel.: (212) 838-7797
8                                        Email:  gfarah@cohenmilstein.com
                                                     mruan@cohenmilstein.com
9

10                                       Kit A. Pierson (*Pro Hac Vice* forthcoming)
11                                       Brent W. Johnson (*Pro Hac Vice* forthcoming)
                                         Laura Alexander (*Pro Hac Vice* forthcoming)
12                                       COHEN MILSTEIN SELLERS & TOLL, PLLC
                                         1100 New York Ave., N.W.
13                                       Suite 500, East Tower
                                         Washington, DC  20005
14                                       Tel.: (202) 408-4600
15                                       Email:  kpierson@cohenmilstein.com
                                                     bjohnson@cohenmilstein.com
16                                                   lalexander@cohenmilstein.com
17

18                                       Manual John Dominguez (*Pro Hac Vice* forthcoming)
                                         COHEN MILLSTEIN SELLERS & TOLL PLLC
19                                       2925 PGA Boulevard, Suite 200
                                         Palm Beach Gardens, FL 33410
20                                       Tel: (561) 833-6575
                                         Email:  jdominguez@cohenmilstein.com
21

22

23

24

25

26

27

28

Case No.                   33

ANTITRUST CLASS ACTION COMPLAINT